Morning ladies and gentlemen. Our first case for argument this morning is Hall v. Chicago. Ms. Nicholas. Good morning. May it please the Court. This case presents questions of fundamental importance to the Fourth Amendment, namely, whether police officers may, as a matter of course, run a citizen's name and identification through law enforcement databases to discover whether they are wanted on warrants during the course of Terry's staffs. The District Court erred in granting summary judgments to the City of Chicago, and the decision should be reversed. As the Supreme Court observed in Terry, far from a petty indignity, a staff at-risk is a serious intrusion on the sanctity of the person, which may inflict great indignity and arouse strong resentment. Thus, the Fourth Amendment demands proper limitations be placed on police authority in the context of Terry's staffs. And Terry itself stated that one of the hallmarks of improper staff is a requirement of individualized suspicion, and the City's The District Court's decision and the City's program of warrant checks countenances a per se rule that detaining a citizen for the purpose of running their name through a law enforcement database is always proper during every stop, so long as it was justified at a citizen's door. Well, yes, it's not a per se rule if you have the clause, as long as it's reasonable to I therefore wonder in what sense you say there's a bad policy here. Is it that, in your view, it is never permissible to run a warrant check? No, it has never been plaintiff's position, and it's not our position today, that it's not permissible under any circumstances. So, you don't say it's never permissible. Chicago doesn't say it's always permissible. And then we have this middle ground. It's permissible when it's reasonable. The magic word in the Fourth Amendment. What's the problem with that? Well, that's not what the City's policy has been. The City's training instructs officers that running a citizen's name through law enforcement databases for warrants is a proper part of every Terry stop. If you look at the City's training video, the officers take the citizen's ID, take it back to the car, and the voiceover says, you will run the person's name. So, are you challenging whether or not it's reasonable to run a warrant check whenever there's probable cause or reasonable suspicion to pull somebody over? What's the scope of what you're arguing is unreasonable? That it is a per se rule here, that the police department has decided that it's permissible to run a warrant check during every single Terry stop so long as it is justified at its initiation. So, you're challenging whether or not they can run a warrant check as long as they have reasonable suspicion of probable cause. You still think in some cases there's a problem with that. Yes, exactly. And is your argument, Ms. Nichols, that the warrant check has to somehow be related to the reason they're pulled over, or is your argument something different than that? That's one circumstance under which it could certainly be justified. If someone is pulled over for a traffic stop, I think the law is pretty clear that a name check, a check of the person's license status, can be run as part of ensuring that the person is lawfully authorized to operate a vehicle. So, you're not saying that in order to run a warrant check, there has to be some reasonable suspicion that the plaintiff is wanted or has a warrant outstanding, are you? That could be a reason why it was justified. But you're not arguing that that should be the floor for it, or that should be what reasonableness is tied to, are you? I think that the warrant check has to be tied to something individualized. So, the city, for example, has made a lot of officer safety justifications, and a particular stop may be based on officer safety considerations. And if that is the circumstance, then running a warrant check may be a reasonable step. Likewise, if the officer becomes suspicious during the course of the stop that there is something going on with this individual that they may have an outstanding warrant, then it could be reasonable to run a name check during those circumstances. But what happens here is that the police believe it is an authorized part of every single Terry stop, no matter what the circumstances are, to find out whether the person is wanted on any warrants. There are many examples in the record of how this extends the detention of people unreasonably. For example, if the police observe someone panhandling in a manner that they believe may be obstructing pedestrian traffic, they're certainly justified in going over to the person and saying, don't block the sidewalk, move over. But that interaction takes seconds, ten seconds or less. So, is your challenge, though, to the front end, the running of it in the first place, or is your challenge to the back end, that it extends the time period that they're seized? It's the second, which is that if the police take the person's identification and just look at their name or ask them what their name is, that's probably a permissible step in almost every interaction between police and citizens where there's some reasonable suspicion. I think HIVAL stands for that. But it's an entirely different investigation if you then take the person's ID card, go back to the car, type in their information, and run their name through various law enforcement databases to find out what their status is and whether they may be wanted on a warrant. So where should the line be drawn if your basis is the time of detention? Where should the line be drawn in terms of what's reasonable for a Terry stop where you're not questioning the stop itself? It is whether the additional investigation is reasonably related to confirming or dispelling the reasonable suspicion that the officer has. And the problem with the city's policies as they currently stand is that they've done away with any requirement of individualized suspicion in order to conduct this separate investigation into the person's status and whether they may be wanted on a warrant. So for example, if you look at the city's own training scenarios that they're currently using to train officers about how to properly conduct a Terry stop, an example is given. The officers observe a group of people, one of whom is drinking a beverage that is in a paper bag. The officer believes the person may be drinking an alcoholic beverage on the public way, approaches them, and the person says, it's Coca-Cola. And then the officer takes the person's ID card, goes back to the car, runs their name to find out if they're wanted for warrants, and then gives back the ID card and lets the person go. And according to the city's training and current policies, that's perfectly permissible and proper. It is our contention that that leads to unreasonable detentions. Would it matter there if the person willingly turned over his ID? I think that there are certainly circumstances under which a voluntary encounter can be permissible. I mean, the police are allowed to ask questions so long as the person is not compelled to stay. However, I think all of the plaintiffs testified that it was never, may I see your ID? It was compelled. And the plaintiffs were left with the impression that their cooperation was not a request for cooperation. It was a demand that they turn over their ID to the police. All the plaintiffs? I think that might be pushing it a little bit, Ms. Nichols. That is what each of the plaintiffs testified to in their depositions, is that they did not feel free to refuse the officer's demands for their identification. And they were seized and could not leave until after the officers returned their identification and said, you are clear. So there are numerous examples in the record of this having happened under circumstances where running the person's name for warrants was not related to why the police were talking to the person in the first place. For example, Mr. Hall is observed holding out a cup, asking for money on the bridge, advised not to block pedestrian traffic, name check clear. Mr. Hall, he appeared to be homeless and the weather was cold. He told the officer, I'll be returning home to my mother's house later tonight. Take his ID, name check clear. So under those circumstances, it seems that the police are under the impression that running a name check is a permissible part of any interaction with a citizen, no matter what the cause for its initiation, no matter what the purpose of the investigation is, and no matter what the suspicion that caused them to initiate the step. And the plaintiff... The district court said that according to the cards that the police officers prepare, these checks are done in approximately two-thirds of cases, not all of them. What are we to make of that fact? Well, there are several things. One is that the city does not have a policy requiring police officers to document when they conduct a name check. So all we have was our statistician's analysis of when it was actually recorded. So we have millions of instances during which name checks were recorded, but we really don't have a way of knowing whether they were conducted more often than that. I would also say that the two-thirds estimate is likely an underestimate because we used a conservative methodology to analyze the database. Our expert witness analyzed a smaller sample of 300 randomly chosen cards and saw that in 78% of those cases, there was a name check indicated. But whether it's 67% or 78%, it is not all. And a good deal of your argument supposes that these are done all the time. I'm asking what is the significance of the fact, I take it an established fact in this record, that they're not done all the time. I think the problem is that the city's policies and training and way of doing business has authorized police officers to do it all the time. And in fact, the police officer's testimony was that they are authorized to conduct a name check every time they conduct a Terry stop, or even a well-being check on an individual. So police officers are given the misimpression that they are authorized to detain individuals for the sole purpose of investigating whether they are wanted or not. That's what the problem is here. The city of Chicago continues to use training materials that have been in use for almost 20 years now that give that exact impression. All of the police officers who were deposed in this case testified that they had never been questioned about name checks they were conducting during their Terry stops. And so when you look at the whole universe of information that the police are getting, both from their supervisors, from the top brass of the department, from the written and video training materials, they were given this false impression that a name check is my time for rebuttal. Thank you. Certainly, Ms. Nicholas. Mr. Hubbard. May it please the court. The district court promptly granted summary judgment to the city on Plaintiff's Monell claim. To begin, it is well established that there can be no municipal liability under Monell where plaintiffs suffered no underlying constitutional harm. Here, in a vast majority of the encounters that plaintiffs alleged, they simply were not seized. Plaintiffs alleged dozens of encounters with the police, but they could recall almost none of those encounters specifically at their depositions. And in the few specific encounters that plaintiffs did recall, they almost across the board testified to no more than officers approaching them, asking whether they had identification, the plaintiffs saying yes and handing it to the officer, the officers conducting a name check, and then returning the identification when Drayton makes clear that asking a person for identification, even when the person is told that he is not told that he may refuse, is not a Fourth Amendment seizure. Rather, the test for a seizure is an objective one and asks whether a reasonable person would believe that he was free to refuse the request or to leave. And it therefore does not matter that certain plaintiffs testified that they did not subjectively believe that they were allowed to refuse or to leave. Here, no plaintiff testified to any officer's use of force, blocking of their paths, threats, commands, or authoritative use of force to compel them to comply. Again, they merely testified the officers asked whether they had identification, whether they could see it, and if the plaintiffs complied and gave it to the officer. And even where CPD documents do show that officers briefly seized plaintiffs in some cases, those records also establish that there was probable cause or reasonable suspicion for those seizures. Where officers observed plaintiffs violating the Panhandling Ordinance or other laws, they had probable cause in those cases to cite plaintiffs or to arrest them. And in such cases, those were not investigatory stops pursuant to Terry and did not have to end as quickly as possible. But even where the officers only had reasonable suspicion to investigate the plaintiffs, the Supreme Court, this Court, and other courts across the country have all held that the Fourth Amendment generally allows officers to conduct name checks during a legitimate Terry stop. These courts have concluded that name checks during stops are helpful to ensure officers' safety. As a matter of law? Doesn't that really depend on what happens? It does depend on the specific facts of the cases, but plaintiffs have actually cited no case in which courts have found facts that have added up to a name check having extended impermissibly beyond that situation. We know, for example, that police can use a drug detection dog, provided it doesn't take too long. I'm worried that you're arguing that these kinds of checks are always permissible, no matter how long it takes, unless you just say that. I'm sorry, Your Honor, that's not correct. These checks have been upheld because they do not unreasonably prolong the stop. Or at least ones that have been contested did not unreasonably prolong stops. I can certainly imagine these checks unduly prolonging stops. It's possible, Your Honor, but the problem for these plaintiffs is that they have no evidence of any such occurrence in any of their stops. None of them testified to the name check itself having extended the stop for an unreasonable period of time, or certainly not beyond the point at which reasonable suspicion had dissipated in their cases. Where should we draw the line? When does it become unreasonable? Unfortunately, as with many things under the Fourth Amendment, that's a case-by-case determination based on the totality of the facts, and so you have to look at the fact of each encounter. And again, plaintiffs couldn't remember the facts of most of their encounters, and in the ones that they did remember, for the most part, they didn't contest that there was reasonable suspicion. They didn't allege that the name check was the reason that officers ever extended any of their encounters for a prolonged period, and for that reason, these plaintiffs simply failed on their evidentiary burden to carry their claims here. There was one plaintiff, I believe, who testified that the encounter took 15 to 20 minutes. The entire encounter did, but that plaintiff also said that the name check itself took a few minutes of that time, and didn't say that the name check was the reason that that encounter extended that long. In fact, that plaintiff couldn't remember the reasons why that encounter occurred, what the officers said to him, why the officers approached them, what the officers did during that time other than run a name check, or how long any of those other activities took. So again, there was simply no evidence that it was the name check that extended that encounter. Do we have any of the plaintiff's allegations match the Supreme Court's pattern of the officer saying, okay, I've got all the information I need, and oh, by the way, now I'm going to run this warrant check. Please hold. That's about the worst case for the city and the best case for the plaintiff. I'm wondering whether we have any that match that. None. Again, most of these plaintiffs couldn't remember anything about these stops, and when they did, they did not testify to anything along those lines. Again, that leaves only a handful of well-being checks, the plaintiffs allege, during which officers ran name checks to ensure the welfare of the plaintiffs who appeared homeless on the streets. And assuming even that those checks were seizures and not simply voluntary or consensual encounters, this Court's decision in Sutterfeld held that officers are allowed to take reasonable steps to ensure an individual's welfare where the officer has legitimate concerns about that person. And here, there was nothing in the evidence to dispute the documents that said the officers stopped or encountered these plaintiffs and asked them for, or had interviewed them and ran their names in order to ensure that they had shelter or had a place to stay or were not missing from the hospital or otherwise reported missing. That's what the officers testified to. Briefly, I'll also address plaintiff's municipal policy arguments. Plaintiffs also failed to establish a municipal policy. Here, plaintiffs waived any challenge to the District Court's rulings that the city's express policies comport with the Fourth Amendment because they do not allow officers to seize people without reasonable suspicion. In fact, for the entire duration of the case, the District Court could not continue a stop. How did they waive that? It's a theory of the case, and you don't have to plead theories. That's correct, Your Honor, but the District Court actually twice dismissed that aspect of their Monell claim on that specific ground, and plaintiffs actually have not challenged that dismissal, that ground for the dismissal of the express policy claim on appeal. Therefore, they've waived the challenge to the District Court's rulings on that express policy issue. So again, for the entire duration of plaintiff's claims, CPD's orders directed that officers could not continue a stop if probable cause had not been established or reasonable suspicion had dissipated. Plaintiff's policymaker claims also failed because every officer testified that he was never directed to conduct name checks during every stop, and in any event, the Fourth Amendment generally allows name checks during stops where there is reasonable suspicion as long as they do not unreasonably extend the stop. And as far as plaintiff's arguments about CPD's training, their failure to train arguments failed because the undisputed evidence shows that CPD's training consistently instructs that stops may not be extended for any reason if reasonable suspicion has dissipated. Plaintiffs ignore all the voluminous recruit and in-service training on this issue. They instead focus on a single hypothetical within a video that was designed to train officers on how to establish reasonable suspicion. But when viewed in the proper context of all CPD's trainings and its express orders that stops may not continue past the point where reasonable suspicion dissipates, it's clear that officers are properly trained. Plaintiffs also cite a few training scenarios contained within CPD's late 2015 rollout of the investigatory stop system. Those training materials postdate by years the encounters that plaintiffs allege in the amended complaint caused them harm, so they therefore could not have caused any harm to plaintiffs. And these isolated scenarios must also be viewed in the context of CPD's orders and its other training that stops may not extend beyond the dissipation of reasonable suspicion. And as far as what's in those training materials, plaintiffs allege that those training materials show that officers should conduct name checks after reasonable suspicion has dissipated. But all those training materials actually state is that at some point an officer conducted a name check. None of them say that the officer did so before reasonable suspicion dissipated. None of them instruct trainees that they should continue to conduct a name check if reasonable suspicion has dissipated. And also it should be noted that since 2014, CPD's orders have expressly stated that an officer may not continue a stop in order to obtain the results of a name check. So unless there are other questions, Your Honors, the city would ask this court to affirm. Thank you, Counsel. Anything further, Ms. Nicholas? With regard to Plaintiff's Monell Theories of Liability here, the policies, the training, the supervisory guidance, and the practices throughout the department are intertwined here. And what they added up to was a message being given to Chicago police officers that it is permissible and appropriate to conduct a name check during every Terry stop without regard to whether it extends the length of time the person is detained. With regard to the plaintiff's testimony and evidence, it is true that the plaintiffs could not identify particular dates during their depositions. But their memories of what happened during their encounters with the Chicago police during which they were name checked were quite clear, which is that the police would demand they hand over their identification card. They would do so. And then the police would walk away with their ID card and either call over a radio or type information into a computer. And they were not free to leave until the officer gave back their ID and said they were clear. And far from the officers testifying that they checked plaintiff's names to check on their well-being, the officers consistently testified that they did not know why they ran the plaintiff's names. And I think there's a reason for that, which is that this was so quotidian. It was being done thousands of times a week. The police officers whom we deposed oftentimes testified that they did this during every stop they made, that it was their routine practice. So really what we have is a jury question. We look at the testimony the officers gave, the testimony the plaintiffs gave, and all of the surrounding evidence, including the documents the city of Chicago produced to us in discovery that show the circumstances of these stops. And when you put this all together, you have a question about whether the city's practices are reasonable and whether the plaintiff's rights were violated. So we are asking for that to be asked thoroughly by the jury, and that plaintiff can proceed on their claims for injunctive relief to halt the ongoing abuses. Unless there are questions? Thank you. Thank you very much. The case is taken under advisement.